IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

KENNETH J. MALONE,                  §
                                    §
          Plaintiff,                §
                                    §
v.                                  §      Civil Action No. H-04-3940
                                    §
BODYCOTE THERMAL PROCESSING,        §
INC.,                               §
                                    §
          Defendant.                §

## MEMORANDUM AND RECOMMENDATION

Pending before the court[1] is Defendant's Motion for Summary Judgment (Docket Entry No. 106) and Plaintiff's and Defendant's objections to summary judgment evidence (Docket Entry Nos. 119 and 128). The court has considered the summary judgment motion, all relevant filings, and the applicable law. For the reasons set forth below, the court **RECOMMENDS** that Defendant's motion be **GRANTED IN PART** and **DENIED IN PART**. As for the objections to evidence, Defendant's objections concerning the depositions of Vernon Gonzales and James Lott are **SUSTAINED**. All other objections to evidence by both parties are **OVERRULED**.

## I.  Case Background

This employment discrimination action was filed by Plaintiff against his former employer.

### A.  Factual History

---

[1]    This case was referred to the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act, and Federal Rule of Civil Procedure 72. Docket Entry No. 24.

Defendant,[2] a company that heat-treats metals, hired Plaintiff in May 1997 as a pyrometry technician and/or a quality control technician.[3] When he started, Plaintiff earned $10.25 per hour and was primarily responsible for testing the quality of the furnaces and calibrating instrumentation.[4] In February 1998, Defendant gave Plaintiff a seventy-five-cent-per-hour raise.[5] Defendant underwent two mergers in 1999 and 2000.[6] Plaintiff's problems began after the first merger. According to some reports, the merger of the workforces resulted in hostility between employees of the two companies.[7]

---

[2]     Lindberg Heat Treating hired Plaintiff. In 1999, Lindberg Heat Treating purchased Houston Heat Treating, and, about a year later, Bodycote Thermal Processing Inc. purchased Lindberg Heat Treating. In this memorandum opinion, the term "Defendant" refers to Plaintiff's employer, regardless of which company owned the business at the time.

[3]     See Defendant's Motion for Summary Judgment, Docket Entry No. 106, Ex. A, Plaintiff's Deposition, pp. 76, 80-81; Ex. H, Declaration of Cyndy Ward, ¶ 2; Plaintiff's Response to Defendant's Motion for Summary Judgment ("Plaintiff's Response"), Docket Entry No. 121, App. 3, Ex. 4, Performance Review; App. 3, Ex. 5, Deposition of Kevin Tackett, pp. 130, 181-82; App. 7, Plaintiff's Declaration, ¶ 2. As is apparent from these cited portions of the record, some disagreement surrounds the issue of what position Plaintiff held during his tenure with Defendant.

[4]     See Defendant's Motion for Summary Judgment, Docket Entry No. 106, Ex. A, Plaintiff's Deposition, pp. 75, 84; Ex. B, Deposition of James Filkowski, p. 259; Ex. Z, letter from James Filkowski ("Filkowski") to Shelton Sparks dated Mar. 15, 2002; but see Plaintiff's Response, Docket Entry No. 121, App. 1, Ex. 2, Payroll Change Form (indicating that Plaintiff's hourly rate was $10.50 as of May 12, 1997).

[5]     Plaintiff's Response, Docket Entry No. 121, App. 3, Ex. 4, Performance Review.

[6]     See Defendant's Motion for Summary Judgment, Docket Entry No. 106, Ex. A, Plaintiff's Deposition, pp. 77-78; Ex. B, Deposition of James Filkowski, pp. 16-17, 20, 24-25.

[7]     See, e.g., Defendant's Motion for Summary Judgment, Docket Entry No. 106, Ex. D, Deposition of Vernon Gonzales, p. 50.

Keith Kieschnick ("Kieschnick"), who was hired in 1995 by Houston Heat Treating Co., performed pyrometry duties for his employer prior to the first merger, under the title of quality control technician.[8]  After the merger with Kieschnick's employer, Plaintiff was the only employee who performed pyrometry duties.[9]  In April 1998, Kieschnick's hourly wage was $11.50, and, in April 2000, it was $13.72.[10]  Kieschnick held the position of quality control technician until he was promoted in 2001.[11]

Around October 20, 1999, Plaintiff found a piece of paper on his windshield that had handwritten on it the letters "KKK" in large print.[12]  Although Plaintiff did not know who put the sign there, a coworker told Plaintiff that the culprit was Jorge Bahena

---

[8]      See id. at Ex. F, Affidavit of Keith Kieschnick, ¶¶ 2, 3.

[9]      See id.; Plaintiff's Response, Docket Entry No. 121, App. 3, Ex. 5, Deposition of Kevin Tackett, p. 137.

[10]      See id. at App. 5, Ex. 15, Payroll Change Form dated Apr. 19, 1998; App. 5, Ex. 19, Payroll Change Form dated Apr. 11, 2000.

[11]      See Defendant's Motion for Summary Judgment, Docket Entry No. 106, Ex. F, Affidavit of Keith Kieschnick, ¶ 2; Plaintiff's Response, Docket Entry No. 121, App. 3, Ex. 5, Deposition of Kevin Tackett, p. 31; App. 5, Ex. 15, Payroll Change Form dated Apr. 19, 1998.  Plaintiff testified that Kieschnick held the position of pyrometry technician.  Defendant's Motion for Summary Judgment, Docket Entry No. 106, Ex. A, Plaintiff's Deposition, pp. 86-87; but see id. at Ex. G, Affidavit of Cyndy Ward, ¶ 3 (stating that Kieschnick never served as pyrometry technician).  Also according to Plaintiff, Defendant promoted Kieschnick to quality control supervisor in November of 2000.  See id. at Ex. A, Plaintiff's Deposition, p. 245; but see id. at Ex. F, Affidavit of Keith Kieschnick, ¶ 2 (denying that he ever held the position of quality control supervisor).

[12]      See id. at Ex. A, Plaintiff's Deposition, pp. 137-40; Ex. P, Houston Police Department complaint, pp. 6-7; Plaintiff's Response, Docket Entry No. 121, App. 7, Plaintiff's Declaration, ¶ 6.

("Bahena"), another coworker.[13]   Plaintiff complained to James
Filkowski ("Filkowski"), general manager, about the incident and
shared his suspicion that Bahena was responsible.[14]

During the course of his employment, various other incidents
disturbed Plaintiff:

1.   Bahena told racially derogatory jokes.[15]

2.   On several occasions, Adam Reyes ("Reyes"), a coworker,
     directed racial slurs at Plaintiff and physically
     threatened him.[16]

3.   Kieschnick, Paul Gamble ("Gamble"), Rafael Gonzales
     ("Ralph"), and other coworkers frequently used the word
     "nigger" in general conversation.[17]

4.   Larry Houghton ("Houghton"), Plaintiff's supervisor, once
     said that it was not "his fault that two niggers run into
     each other and one of them died."[18]

---

[13]   See Defendant's Motion for Summary Judgment, Docket Entry No. 106,
Ex. A, Plaintiff's Deposition, pp. 140-42.  Although Plaintiff strongly asserts
that Bahena placed the sign on his car, he stated in a complaint to the Houston
Police Department dated November 2000 that he believed the handwriting was that
of Kieschnick.   See id. at Ex. P, Houston Police Department complaint, p. 7.

[14]   See id. at Ex. A, Plaintiff's Deposition, p. 142.

[15]   See id. at pp. 108-09.

[16]   See id. at pp. 114-15, 117.

[17]   See id. at pp. 160-61, 185-86; Ex. D, Deposition of Vernon Gonzales,
p. 92; Plaintiff's Response, Docket Entry No. 121, App. 6, Ex. 38, Declaration
of Vernon Gonzales, ¶ 4; App. 7, Plaintiff's Declaration, ¶ 5.  Vernon Gonzales
("Gonzales"), a coworker, heard Ralph call Plaintiff a "[s]tupid nigger."   See
Defendant's Motion for Summary Judgment, Docket Entry No. 106, Ex. D, Deposition
of Vernon Gonzales, p. 119.

[18]   See id. at Ex. A, Plaintiff's Deposition, p. 166.  Apparently, this
is a reference to the fatal car accident, involving Plaintiff and another
African-American man, that occurred in September 2001.  James Lott ("Lott"),
Plaintiff's coworker, also overheard Houghton say that he did not want to adopt
an African-American child because African-Americans have nappy hair, and he would
not know how to take care of it.   See id. at Ex. C, Deposition of James Lott, pp.
100-01.   Houghton sent Plaintiff a responsive e-mail to one from Plaintiff
entitled "Grooving" and changed the title to "Groovin'."   See Plaintiff's

5.    On at least two occasions, the word "nigger" was spray-painted on the wall in the men's bathroom.[19]

6.    Plaintiff found some papers in a desk that included several pages of jokes, many of which demean African Americans in obscene and offensive ways.[20]

7.    Daniel Willson ("Willson") told another employee that whites had it made until the Yankees freed the slaves.[21]

---

Response, Docket Entry No. 121, App. 7, Plaintiff's Declaration, Ex. 5, e-mail from Houghton to Plaintiff dated Sept. 14, 2001.  Therein, Houghton wrote that Plaintiff's time at home was his time "to sleep, drink a 40, or whatever you enjoy doing in your off time."   Id.

[19]    See Defendant's Motion for Summary Judgment, Docket Entry No. 106, Ex. A, Plaintiff's Deposition, p. 191; Ex. C, Deposition of James Lott, pp. 57-58; Plaintiff's Response, Docket Entry No. 121, App. 7, Plaintiff's Declaration, ¶ 5.  Lott recalled that, on several occasions, he noticed the word by itself written over the urinal and in a stall in normal size print.  See Defendant's Motion for Summary Judgment, Docket Entry No. 106, Ex. C, Deposition of James Lott, pp. 58-59.  Gonzales remembered seeing the word scratched on the restroom wall once and the acronym "KKK" written on the restroom walls at least twice.  See id. at Ex. D, Deposition of Vernon Gonzales, pp. 113, 114; Plaintiff's Response, Docket Entry No. 121, App. 6, Ex. 38, Declaration of Vernon Gonzales, ¶ 7.

[20]    See Defendant's Motion for Summary Judgment, Docket Entry No. 106, Ex. A, Plaintiff's Deposition, pp. 204-05, 209; Ex. Q, undated letter from Plaintiff to Jeff Bell, p. 2 (unnumbered); Plaintiff's Response, Docket Entry No. 121, App. 7, Plaintiff's Declaration, ¶¶ 5, 11; Ex. 8, joke documents; Ex. 16, cartoon.  Among the so-called jokes are the following:

What's the difference between a nigger and a tire?
-Tires don't sing when you put chains on them.

A Polock and a nigger jump out of a plane at the same time; who hits the ground first?
-Who cares?

Why did they build the bay bridge?
-So the niggers could swim over in the shade.

The document contains equally insensitive and hostile jokes about Jews, Italians, Greeks, Poles, and others.

[21]    See Defendant's Motion for Summary Judgment, Docket Entry No. 106, Ex. C, Deposition of James Lott, p. 96; Plaintiff's Response, Docket Entry No. 121, App. 4, Ex. 9, e-mail from Plaintiff to Filkowski dated Aug. 24, 2001.

8.  Plaintiff was required to attend trainings that non-African Americans were not required to attend.[22]

9.  Bahena, Reyes, Kieschnick, Houghton, Joe Casares, and Ralph tampered with and/or damaged Plaintiff's vehicle.[23]

10.  Coworkers attempted to frame Plaintiff for theft.[24]

11.  Plaintiff's paycheck did not always match up with the number of hours he worked or contained other errors.[25]

12.  Houghton called Plaintiff at home after his shift and "was usually belligerent and just harassing and annoying and disrespectful."[26]

13.  Plaintiff's supervisors delayed ordering supplies that he needed to complete his job duties.[27]

14.  Plaintiff's tools and uniforms were stolen at work.[28]

15.  Plaintiff received a negative review from Willson who was the supervisor of the maintenance department.[29]

----

[22]    See Defendant's Motion for Summary Judgment, Docket Entry No. 106, Ex. A, Plaintiff's Deposition, pp. 193-94.  Plaintiff bases this assertion largely on his own assumptions.  See id.

[23]    See id. at p. 145; Ex. D, Deposition of Vernon Gonzales, pp. 86, 110; Ex. P, Houston Police Department complaint, p. 2, 3, 8, 9; Plaintiff's Response, Docket Entry No. 121, App. 7, Plaintiff's Declaration, ¶ 9.

[24]    See Defendant's Motion for Summary Judgment, Docket Entry No. 106, Ex. A, Plaintiff's Deposition, pp. 221-22, 237.

[25]    See id. at pp. 286-89; Ex. H, Declaration of Cyndy Ward, ¶ 3; Plaintiff's Response, Docket Entry No. 121, App. 7, Plaintiff's Declaration, ¶ 8; Ex. 1, e-mail from Plaintiff to Cyndy Brotsky dated Aug. 9, 2001.

[26]    See Defendant's Motion for Summary Judgment, Docket Entry No. 106, Ex. A, Plaintiff's Deposition, p. 296; see also id. at pp. 294-97.

[27]    See id. at p. 298; cf. id. at Ex. L, e-mail from Plaintiff to Willson, Filkowski, Houghton, and Gamble dated Aug. 1, 2001 (making reference to the fact that he was not responsible for order required materials for his job and intimating that caused survey delays).

[28]    See id. at Ex. A, Plaintiff's Deposition, pp. 299-300, 302-05; Ex. P, Houston Police Department complaint, p. 9.

[29]    See id. at Ex. A, Plaintiff's Deposition, p. 196; Ex. M, e-mail from Plaintiff to Filkowski and Houck dated Aug. 24, 2001.

16.    Someone threw a rag that was on fire into the oil-covered area where Plaintiff was working; someone threw metal bolts in Plaintiff's direction; and someone removed ladders from beneath him.[30]

17.    Ralph asked Plaintiff to borrow some change, and, when Plaintiff agreed, Ralph took the change out of Plaintiff's truck without Plaintiff's permission.[31]

Plaintiff regularly reported these incidents to general manager Filkowski and supervisors Houghton and Gamble.[32]   They indicated to Plaintiff that they would talk to the person accused, but Plaintiff was not aware of the outcome as to any incident he reported.[33]   The bathroom walls were painted to cover the racially derogatory terms.[34]   When Plaintiff reported Reyes' conduct to Gamble on one occasion, Gamble simply said, "That's Adam."[35]

---

[30]    See Plaintiff's Response, Docket Entry No. 121, App. 7, Plaintiff's Declaration, ¶ 10.

[31]    See Defendant's Motion for Summary Judgment, Docket Entry No. 106, Ex. P, Houston Police Department complaint, p. 11.

[32]    See id. at Ex. A, Plaintiff's Deposition, pp. 117-124, 161, 191-92; Ex. B, Deposition of James Filkowski, pp. 102-03, 105-06, 173, 262-63, 267; Ex. Y, undated letter from Plaintiff to Filkowski; Plaintiff's Response, Docket Entry No. 121, App. 4, Ex. 9, e-mail from Plaintiff to Filkowski dated Aug. 24, 2001; App. 5, Ex. 24, e-mail from Plaintiff to Filkowski dated July 9, 2001.   In response to a question concerning how often Plaintiff reported Reyes for racial discrimination, Plaintiff stated, "Possible weekly.   I mean, I don't know.   It was more than once."   Defendant's Motion for Summary Judgment, Docket Entry No. 106, Ex. A, Plaintiff's Deposition, p. 117; see also id. at p. 120.

[33]    See id. at p. 118, 191-92.

[34]    See id. at p. 192; Ex. D, Deposition of Vernon Gonzales, p. 143.

[35]    See id. at Ex. A, Plaintiff's Deposition, p. 124.

Plaintiff also complained about discrimination to Jeff Bell ("Bell"), regional manager, more than once.[36]

Sometime in 2001, Plaintiff requested a shift change to the overnight shift.[37]  Plaintiff told Houghton:

> That I was tired of all the mess that had been going on there, you know, the harassment, and you know, racism, tampering with my duties, stealing of my tools, the tampering with my vehicle.  I was just tired of it, and I felt that if I went to the third shift, that, you know, it's possible they'd go away.[38]

In August 2001, Defendant transferred Plaintiff to the overnight shift.[39]

During Plaintiff's overnight shift on September 28-29, 2001, Plaintiff observed "someone crawl from beneath [Plaintiff's] car."[40] Plaintiff chased the person, but could not catch up with him.[41]  A few minutes later, Plaintiff encountered Robert Gutierrez

---

[36]     See id. at pp. 121-22; Ex. Q, undated letter from Plaintiff to Bell; Plaintiff's Response, Docket Entry No. 121, App. 7, Plaintiff's Declaration, Ex. 21, undated letter from Plaintiff to Bell.

[37]     See Defendant's Motion for Summary Judgment, Docket Entry No. 106, Ex. A, Plaintiff's Deposition, pp. 91-92; Ex. Q, undated letter from Plaintiff to Bell, p. 2 (unnumbered).

[38]     See id. at Ex. A, Plaintiff's Deposition, p. 91.  Plaintiff also sought a shift change to allow him to get caught up with the furnace surveys. See id. at pp. 91-92; Ex. K, e-mail from Plaintiff to Houghton, Filkowski, Gamble, and Robert Gutierrez ("Gutierrez") dated Aug. 1, 2001; Ex. L, e-mail from Plaintiff to Willson, Filkowski, Houghton, and Gamble dated Aug. 1, 2001.

[39]     See id. at Ex. A, Plaintiff's Deposition, p. 96; Plaintiff's Response, Docket Entry No. 121, App. 5, Ex. 25, e-mail from Willson to Cyndy Brotsky dated Aug. 13, 2001.

[40]     See Defendant's Motion for Summary Judgment, Docket Entry No. 106, Ex. A, Plaintiff's Deposition, p. 30; see also id. at pp. 26-29.

[41]     See id. at p. 30.

("Gutierrez"), who said that he planned to borrow a company vehicle.[42]  Plaintiff followed Gutierrez, and, having decided that he was stealing from Defendant, Plaintiff called the police.[43] Although the police officer questioned Gutierrez, the officer did not arrest Gutierrez.[44]  Defendant terminated Gutierrez for theft the following Monday.[45]

On the day that Plaintiff reported Gutierrez for theft, Plaintiff completed his shift at 5:00 a.m. and left Defendant's property.[46] He remained awake for the entirety of the day following his shift and drank liquor to the point of intoxication.[47]  Around 8:00 p.m. on September 29, 2001, Plaintiff was involved in an automobile collision that took the life of another man.[48]  As a result of the accident, Plaintiff was charged with intoxication manslaughter.[49]

Plaintiff returned to work on October 18, 2001, after recovering from the injuries he sustained in the accident.[50]  In

---

[42]    See id. at pp. 26, 32.

[43]    See id. at pp. 27-29.

[44]    See id. at pp. 29, 32.

[45]    See id. at Ex. B, Deposition of James Filkowski, p. 56.

[46]    See id. at Ex. A, Plaintiff's Deposition, p. 33.

[47]    See id. at pp. 20, 25, 33.

[48]    See id. at Ex. E, accident report.

[49]    See id.

[50]    See id. at Ex. A, Plaintiff's Deposition, p. 126.

November 2001, Defendant promoted Kieschnick to customer service manager.[51]   In December, Defendant posted a job opening for the position of quality control/quality assurance supervisor, and Plaintiff requested that he be considered.[52]   Defendant promoted Bahena from shipping and receiving supervisor to quality control assistant, also a supervisory position, in January 2002.[53]   His hourly wage increased from $13.00 per hour to $13.75 per hour.[54]

On January 18, 2002, Bell received one of several complaint letters sent to him by Plaintiff.[55]   In a letter dated January 22, 2002, Filkowski notified Plaintiff that he was being moved from the overnight shift back to the morning shift in order to facilitate better communication between Plaintiff and Houghton and/or

---

[51]     See id. at Ex. T, Payroll Authorization Form; Ex. U, memorandum from Filkowski to all employees dated Oct. 31, 2001.

[52]     See id. at Ex. A, Plaintiff's Deposition, p. 261; Plaintiff's Response, Docket Entry No. 121, App. 7, Plaintiff's Declaration, ¶ 22; but see Defendant's Motion for Summary Judgment, Docket Entry No. 106, Ex. A, Plaintiff's Deposition, p. 278 (stating he was not clear whether he actually signed up to be considered); Ex. V, Job Opening (lacking Plaintiff's signature).   Filkowski testified that Defendant followed a process of posting openings and allowing interested employees the opportunity to sign up for consideration.   Defendant's Motion for Summary Judgment, Docket Entry No. 106, Ex. B, Deposition of James Filkowski, p. 159.   Plaintiff only remembered having a general discussion regarding promotion opportunities with Filkowski and Houghton.   See id. at Ex. A, Plaintiff's Deposition, pp. 280-81.   Lott testified that Plaintiff said he would not apply for the position because he believed Lott would get the job.   See id. at Ex. C, Deposition of James Lott, p. 155.

[53]     See id. at Ex. A, Plaintiff's Deposition, pp. 252-53; Ex. R, Employee Change of Status Form.

[54]     See id. at Ex. R, Employee Change of Status Form.

[55]     See id. at Ex. X, letter from Bell to Plaintiff dated Jan. 24, 2002.

Filkowski.[56]   The letter indicated that Plaintiff would remain on the day shift until the furnace surveys became current and Plaintiff was able to cross-train Bahena.[57]   Filkowski also wrote:

> You've made several accusations of misconduct on the part of our employees, including theft and racism.   As I stated, I have not and will not tolerate any such activity.   The one instance where I was able to substantiate such activity resulted in an employee's termination.[58]   Any future suspicion of such activity must be brought to my attention immediately.[59]

At some point in time, Plaintiff was convicted for his actions causing the accident on September 29, 2001, and was sentenced to prison.[60]   Plaintiff's last day of work with Defendant was June 4, 2002, immediately preceding his imprisonment.[61]   At the time of his separation, Plaintiff's wage was $12.35 per hour.[62]

**B.   <u>Procedural History</u>**

In late September 2003, Plaintiff filed suit against his former employer in state court, asserting various claims under

---

[56]    <u>See</u> <u>id.</u> at Ex. A, Plaintiff's Deposition, p. 97; Ex. W, letter from Filkowski to Plaintiff dated Jan. 22, 2002.

[57]    <u>See</u> <u>id.</u> at Ex. W, letter from Filkowski to Plaintiff dated Jan. 22, 2002.

[58]    Apparently, this is a reference to Gutierrez's termination.   <u>See</u> <u>id.</u> at Ex. A, Plaintiff's Deposition, p. 109.

[59]    <u>Id.</u> at Ex. W, letter from Filkowski to Plaintiff dated Jan. 22, 2002.

[60]    <u>See</u> <u>id.</u> at Ex. A, Plaintiff's Deposition, p. 19.

[61]    <u>See</u> <u>id.</u> at p. 79; Ex. H, Declaration of Cyndy Ward, ¶ 5; Ex. CC, Employee Change of Status Form.

[62]    <u>See</u> <u>id.</u> at Ex. A, Plaintiff's Deposition, p. 85.

state law.[63]  Nine months later, Plaintiff added federal claims for the first time.[64]  Upon the discovery of Plaintiff's federal claims, Defendant removed the case to this court on October 13, 2004.[65]

In January 2005, the court held a scheduling conference, but did not issue a scheduling order.[66]  Instead, the court ordered Defendant to file a dispositive motion.[67]  After Defendant filed its first motion for summary judgment, the court allowed Plaintiff additional time to request discovery from Defendant and to respond.[68]

In February 2006, the court issued a Memorandum, Recommendation, and Order addressing Defendant's motion.[69]  In addition to ruling on numerous nondispositive motions filed by Plaintiff, the court recommended that Defendant's motion for summary judgment be granted in part and denied in part.[70]  The court recommended dismissal of all of Plaintiff's federal and state claims except the 42 U.S.C. § 1981 hostile work environment and

---

[63]    See Notice of Removal, Docket Entry No. 1, Ex. A-1, Plaintiff's Original Petition.

[64]    See id. at Ex. A-12, Plaintiff's First Amended Original Complaint.

[65]    See Notice of Removal, Docket Entry No. 1, p. 2.

[66]    See Minute Entry Order dated Jan. 18, 2005, Docket Entry No. 10.

[67]    Id.

[68]    See Minute Entry Order dated Nov. 29, 2005, Docket Entry No. 41.

[69]    See Docket Entry No. 65.

[70]    See id.

12

discrimination claims, the intentional invasion of or interference with property rights claim, and the gross negligence exemplary damages claim.[71]   The Memorandum, Recommendation, and Order was adopted by the district court in March 2006.[72]

In May 2006, the court granted Plaintiff's motion for reconsideration to appoint counsel and appointed Plaintiff's present counsel to the case.[73] During that same month, the case was reassigned between district judges, but the referral to the undersigned was retained.[74]

Following an extension of time for discovery, Plaintiff filed a third amended complaint, with leave of court, that alleged the claims remaining after the first summary consideration: hostile work environment and discrimination under 42 U.S.C. § 1981, interference with property, and gross negligence claims.[75]   The amended complaint also included a new claim of retaliation under 42 U.S.C. § 1981.[76]

Two months later, Plaintiff sought leave to file a fourth amended complaint in which Plaintiff sought to add one factual

---

[71]   See id.

[72]   See Order dated Mar. 15, 2006, Docket Entry No. 70.

[73]   See Order dated May 11, 2006, Docket Entry No. 77.

[74]   See Notice of Reassignment, Docket Entry No. 78; Clerk's Notice of Retained Referral, Docket Entry No. 79.

[75]   Docket Entry No. 90; see also Order dated June 21, 2006, Docket Entry No. 89.

[76]   See Third Amended Complaint, Docket Entry No. 90.

13

statement, to drop his interference with property and gross negligence claims, and to substitute a premises liability claim.[77] Within a matter of a few days of Plaintiff's motion for leave to file a fourth amended complaint, Defendant filed a second motion for summary judgment in which it challenged all of the claims asserted in Plaintiff's previously filed third amended complaint.[78]

At a hearing on the issue of leave to file the fourth amended complaint, the court indicated that it would not allow Plaintiff to add the premises liability claim at this late stage in the proceedings, but would allow the addition of the one factual statement that was included in the proposed amendment.[79] Plaintiff's counsel opined that, in light of the court's decision, Plaintiff may choose not to drop the interference with property and gross negligence claims that were absent from the proposed fourth amended complaint.[80]   Upon suggestion of the court, Plaintiff's counsel withdrew the proposed fourth amended complaint in favor of filing a supplemental third amended complaint.[81]

---

[77]   See Docket Entry No. 105.

[78]   See Docket Entry No. 106.

[79]   See Minute Entry Order dated Nov. 13, 2006, Docket Entry No. 116; hearing on Nov. 13, 2006.

[80]   See hearing on Nov. 13, 2006.

[81]   See Minute Entry Order dated Nov. 13, 2006, Docket Entry No. 116; hearing on Nov. 13, 2006.

14

As a supplement, Plaintiff filed a document that is identical to his complete third amended complaint in every way except for the addition of a footnote regarding later-acquired testimony, the addition of the previously mentioned factual statement, and the omission of the interference with property and gross negligence claims.[82]  Due to the legal effect of a supplement (as opposed to an amendment), however, the unmentioned state law claims remain at issue in this case.  The court now considers Defendant's second summary judgment motion.

## II.  Summary Judgment Standard

Summary judgment is warranted when the evidence reveals that no genuine dispute exists regarding any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Brown v. City of Houston, Tex., 337 F.3d 539, 540-41 (5th Cir. 2003).  A material fact is a fact that is identified by applicable substantive law as critical to the outcome of the suit.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Ameristar Jet Charter, Inc. v. Signal Composites, Inc., 271 F.3d 624, 626 (5th Cir. 2001).  To be genuine, the dispute regarding a material fact must be supported by evidence such that a reasonable jury could resolve the issue in favor of either party.  Anderson, 477 U.S. at

---

[82]    Compare Third Amended Complaint, Docket Entry No. 90 with Plaintiff's Supplement to Third Amended Complaint, Docket Entry No. 118.

250; <u>TIG Ins. Co. v. Sedgwick James of Wash.</u>, 276 F.3d 754, 759 (5th Cir. 2002).

The movant must inform the court of the basis for the summary judgment motion and must point to relevant excerpts from pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of genuine factual issues. <u>Celotex Corp.</u>, 477 U.S. at 323; <u>Topalian v. Ehrman</u>, 954 F.2d 1125, 1131 (5th Cir. 1992). If the moving party can show an absence of record evidence in support of one or more elements of the case for which the nonmoving party bears the burden, the movant will be entitled to summary judgment. <u>Celotex Corp.</u>, 477 U.S. at 322. In response to a showing of lack of evidence, the party opposing summary judgment must go beyond the pleadings and proffer evidence that establishes each of the challenged elements of the case, demonstrating that genuine issues of material fact do exist which must be resolved at trial. <u>Id.</u> at 324.

When considering the evidence, "[d]oubts are to be resolved in favor of the nonmoving party, and any reasonable inferences are to be drawn in favor of that party." <u>Evans v. City of Houston</u>, 246 F.3d 344, 348 (5th Cir. 2001); <u>see also</u> <u>Boston Old Colony Ins. Co. v. Tiner Assocs. Inc.</u>, 288 F.3d 222, 227 (5th Cir. 2002). The court should not "weigh evidence, assess credibility, or determine the most reasonable inference to be drawn from the evidence." <u>Honore v. Douglas</u>, 833 F.2d 565, 567 (5th Cir. 1987).

However, the nonmoving party must show more than "some metaphysical doubt as to the material facts." Meinecke v. H & R Block of Houston, 66 F.3d 77, 81 (5th Cir. 1995). Conclusory allegations, unsubstantiated assertions, improbable inferences, unsupported speculation, or only a scintilla of evidence will not carry this burden. Brown, 337 F.3d at 541; Ramsey v. Henderson, 286 F.3d 264, 269 (5th Cir. 2002). The court must grant summary judgment if, after an adequate period of discovery, the nonmovant fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp., 477 U.S. at 322.

### III.  Summary Judgment Motion

Defendant moves for summary judgment on all of Plaintiff's claims. The court first addresses Plaintiff's 42 U.S.C. § 1981 claims and then turns to the remaining state law claims.

### A.  42 U.S.C. § 1981

Section 1981 provides an avenue of recourse for persons who experience racial discrimination in employment. See 42 U.S.C. § 1981; Jones v. R.R. Donnelley & Sons Co., 541 U.S. 369, 383 (2004). Claims are analyzed according to the legal principles applicable to cases brought under the Civil Rights Act of 1964 ("Title VII"). Patel v. Midland Mem'l Hosp. & Med. Ctr., 298 F.3d 333, 342 (5th Cir. 2002)stating that the standards on summary judgment for

discrimination claims are the same under 42 U.S.C. § 1983 as under Title VII); <u>Foley v. Univ. of Houston Sys.</u>, 355 F.3d 333, 340 n.8 (5th Cir. 2003)(stating that same criteria applies to Title VII and 42 U.S.C. § 1983 retaliation claims).

### 1. <u>Hostile Work Environment</u>

In order to maintain a claim of hostile work environment based on race discrimination, a plaintiff must demonstrate that: 1) he is a member of a protected group; 2) he was subjected to unwelcome harassment; "3) the harassment complained of was based on race; 4) the harassment affected a term, condition, or privilege of employment;" and, in cases of harassment alleged against coworkers, 5) the employer knew or should have known of the harassment and failed to take prompt remedial action. <u>Ramsey</u>, 286 F.3d at 268; <u>see also</u> <u>Frank v. Xerox Corp.</u>, 347 F.3d 130, 138 (5th Cir. 2003). Whether an environment is hostile or abusive depends on a totality of circumstances, focusing on factors such as the frequency of the conduct, the severity of the conduct, the degree to which the conduct is physically threatening or humiliating, rather than merely offensive, and the degree to which the conduct unreasonably interferes with an employee's work performance. <u>Turner v. Baylor Richardson Med. Ctr.</u>, 476 F.3d 337, 347 (5th Cir. 2007).

Discourtesy, rudeness, teasing, offhand comments, and isolated incidents (unless extremely severe) do not amount to "discriminatory changes in the terms and conditions of employment."

Indest v. Freeman Decorating, Inc., 164 F.3d 258, 264 (5th Cir. 1999) (internal quotations omitted); see also Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998).  The conduct about which the plaintiff complains must be both objectively and subjectively offensive.  Shepherd v. Comptroller of Pub. Accounts of the State of Tex., 168 F.3d 871, 874 (5th Cir. 1999).  A hostile work environment is one in which the abuse is continuous, not simply episodic.  See Faragher, 524 U.S. at 787 n.1.

Defendant focuses its attack on the third and fourth elements of Plaintiff's harassment claim.  Defendant argues that many of the incidents of harassment alleged by Plaintiff were not related to his race and that those that were based on race were not severe or pervasive enough to meet Plaintiff's prima face burden.  Plaintiff argues that he was harassed, consistently and severely, on the basis of race.  The court agrees with Defendant that not all of Plaintiff's allegations of harassment raise concerns of racial

19

discrimination[83] and finds it necessary to look more closely at those that do.

Plaintiff complains of racial harassment by both supervisors and coworkers. The alleged harassment included racially derogatory jokes or comments overheard in the workplace, one set of documents containing written jokes and cartoons that are especially humiliating, regular usage of racial slurs such as "nigger" in workplace conversation, periodic usage of racial slurs directed at Plaintiff and accompanied by physical threats, presence of racially-charged graffiti in the restroom on more than one occasion, and placement of a handwritten "KKK" sign on Plaintiff's car. All of the alleged harassment occurred between mid October 1999 and early June 2002.

The court finds that, even though most of the charged conduct consisted only of written and spoken words, and not physical threats, the extremely insulting content and the visual impact increased the severity. Additionally, the number and regularity of

---

[83]     Some evidence suggests that race may not have motivated at all the treatment to which other employees subjected Plaintiff. Plaintiff admitted that his reports of theft from the company and vandalism to his vehicle may have been motivating factors. See Defendant's Motion for Summary Judgment, Docket Entry No. 106, Ex. A, Plaintiff's Deposition, pp. 222-23 ("I report[ed] to Mr. Filkowski that Jorge [Bahena] tampered with my vehicle. And he goes and says, Well, Kenneth says you tampered with your [sic] vehicle. Then these guys would get just belligerent and – and – and really start harassing me."), pp. 239-40 ("Q.  Okay.  And did you think they were upset that you were reporting these things to Mr. Filkowski?  A.  Yes, sir. . . . Q.  So, if that was going on and you were going to expose it, then wouldn't that be a motive for these people to try to get back at you? . . . . A.  Yes, yes, sir.  To my – to the best of my knowledge, it would seem like a motive."). Gonzales testified that quite a few employees were unhappy with Plaintiff for reporting Gutierrez. See id. at Ex. D, Deposition of Vernon Gonzales, pp. 187-88.

20

the incidents is sufficient to raise a fact issue on pervasiveness. Contrary to Defendant's assertion, the allegations do not amount to "a few isolated incidents of racial enmity."[84]   Moreover, some of the epithets were directed at Plaintiff and involved physical threats.

Defendant questions whether Plaintiff was subjectively offended because he did not mention the racial slurs in his written communication with company management and the police department,[85] his conversations with coworkers,[86] or in the early pleadings in this case.[87]   On the other hand, Plaintiff's behavior concerning some matters, such as his response to the "KKK" sign, suggests that he was very offended.[88]   Although Plaintiff's silence on some issues does raise the question of whether Plaintiff was offended, subjective offensiveness is a question best left to the jury.   The

---

[84]   Defendant's Motion for Summary Judgment, Docket Entry No. 106, p. 19 (quoting McBride v. Heath & Heath Hardware, No. Civ.A. 6:04CV361, 2005 WL 1705750, at *5 (E.D. Tex. July 20, 2005)(unpublished).   In its motion, Defendant isolates each category of alleged conduct to be considered separately.   Although the alleged harassment took various forms, it was similar enough in motivation to be viewed collectively.

[85]   See, e.g., id. at Ex. P,  Houston Police Department complaint; Ex. Q, undated letter from Plaintiff to Bell; Ex. Y, undated letter from Plaintiff to Filkowski.

[86]   See id. at Ex. C, Deposition of James Lott, p. 20.

[87]   See, e.g., id. at Ex. DD, Plaintiff's Original Petition; Ex. EE, Plaintiff's First Supplemental Original Petition; Ex. FF, Plaintiff's Second Supplemental Original Petition; Ex. GG, Plaintiff's First Amended Petition; Ex. HH, Plaintiff's First Amended Original Complaint; Ex. II, Plaintiff's Second Amended Complaint.

[88]   See id. at Ex. D, Deposition of Vernon Gonzales, p. 111.

objective offensiveness of the behavior alleged by Plaintiff is beyond doubt.

Taken as a whole, Plaintiff's evidence suggests harassment that was sufficiently severe, pervasive, and offensive to raise a fact issue as to whether the harassment affected a term, condition, or privilege of his employment.  This claim should not be dismissed.

### 2. <u>Discrimination and Retaliation</u>

In the absence of direct evidence, courts analyze discrimination and retaliation claims under the burden-shifting approach first articulated in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973), and modified in <u>Desert Palace, Inc. v. Costa</u>, 539 U.S. 90 (2003), and <u>Rachid v. Jack In The Box, Inc.</u>, 376 F.3d 305 (5th Cir. 2004).

Under the "modified <u>McDonnell Douglas</u> approach," a plaintiff may trigger a presumption of discrimination by establishing a prima facie case.  <u>Rachid</u>, 376 F.3d at 312.  Once a plaintiff has established a prima facie case, the burden shifts to the defendant to proffer legitimate, non-discriminatory reasons for its actions. <u>Id.</u>  If the defendant satisfies this burden, then the presumption of discrimination dissolves.  <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 142-43 (2000); <u>Price v. Fed. Express Corp.</u>, 283 F.3d 715, 720 (5th Cir. 2002).

The plaintiff must then offer evidence to create an issue of fact "either (1) that the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that the defendant's reason, while true, is only one of the reasons for its conduct, and another motivating factor is the plaintiff's protected characteristic (mixed-motives alternative)." Rachid, 376 F.3d at 312 (internal quotation and alteration marks omitted).  If the plaintiff shows that the illegal discrimination was a motivating factor, the defendant must respond with evidence that the same employment decision would have been made regardless of discriminatory animus.  Rachid, 376 F.3d at 312.

### a.  Discrimination

Plaintiff alleged that Defendant discriminated against him by paying him disparate wages and failing to promote him.  The court examines each allegation in turn.[89]

Discrimination in the form of unequal compensation may be proven by showing that Plaintiff is a member of a protected class and was paid less than someone outside the protected class for work requiring substantially the same responsibility.  See Uviedo v. Steves Sash & Door Co., 738 F.2d 1425, 1431 (5th Cir. 1984); see also Williams v. Galveston Indep. Sch. Dist., 78 Fed. Appx. 946,

---

[89]     Plaintiff focuses his wage comparison on Kieschnick, but briefly mentions that he "consistently made lower wages than both Bahena and Daniel Willson who are not African-American."  Plaintiff's Response, Docket Entry No. 121, p. 30.   The evidence offers no support for Plaintiff's claims of discrimination based on the comparison of his wages to those of Bahena and Willson.

949 (5th Cir. 2003)(unpublished); <u>Pittman v. Hattiesburg Mun.</u>
<u>Separate Sch. Dist</u>., 644 F.2d 1071, 1074 (5th Cir. Unit A May 1981).
In considering whether two jobs require substantially the same
responsibility, the court looks to the jobs' duties, including the
jobs' relative supervisory authority and responsibility for
revenue. <u>Williams</u>, 78 Fed. Appx. at 949 (citing <u>Uviedo</u>, 738 F.2d
at 1431; <u>Pittman</u>, 644 F.2d at 1074; <u>Cullen v. Ind. Univ. Bd. of</u>
<u>Trs.</u>, 338 F.3d 693, 700 (7th Cir. 2003)).

Defendant challenges Plaintiff's evidence in support of the
assertion that Plaintiff and Kieschnick performed work that
required substantially the same responsibility and argues that any
difference in wages between the two was justified by the "wide
range of duties in the Quality Department that Malone did not
perform."[90] Plaintiff counters with evidence that both Plaintiff
and Kieschnick worked as quality control technicians in the time
period May 1997 through 2001. Plaintiff also contends that
Plaintiff met Defendant's performance expectations while Kieschnick
did not and that Plaintiff had more education and more job duties
than Kieschnick. The court is constrained by the conflicting
evidence in the summary judgment record.

---

[90] Defendant's Motion for Summary Judgment, Docket Entry No. 106, p. 28.
In its brief, Defendant also discusses Plaintiff's allegations of pay
discrimination based on errors in pay, which Plaintiff asserted during earlier
stages of this proceeding. Based on the lack of response to this argument,
Plaintiff apparently no longer is contending that the alleged errors in some of
his paychecks form the basis for a discrimination claim. It is just as well that
he has abandoned that claim because the errors alleged were very minor and were
corrected; thus, they could not be viewed as amounting to an adverse employment
action.

24

The evidence shows that Kieschnick initially was hired to the position of quality control technician.  Kieschnick performed pyrometry duties prior to the merger of his company and Plaintiff's company.  After the merger, only Plaintiff performed the pyrometry duties.  Plaintiff testified, however, that his responsibilities changed at some point, and he became a quality control technician. Defendant's office manager affirmed that Kieschnick never held the position of pyrometry technician, but did not contradict Plaintiff's assertion that he was classified as a quality control technician.  In fact, Plaintiff's performance review dated February 10, 1998, reads, "Kenneth continues to do an excellent job as a QC Technician, focusing on all aspects of pyrometry."[91]  Thus, the evidence raises a fact issue on whether Plaintiff and Kieschnick held the same position while employed by Defendant.

Despite Defendant's contention that any difference in wages was justified by the broader range of duties allegedly assigned to Kieschnick, the summary judgment evidence fails to establish this point.  The record contains little that illuminates the precise duties of a quality control technician and nothing to explain why Plaintiff's responsibilities while in that position would have been significantly different from Kieschnick's duties.  Certainly, the evidence reveals no difference in supervisory authority or

[91]    Plaintiff's Response, Docket Entry No. 121, App. 3, Ex. 4, Performance Review.

25

responsibility for revenue between the two employees' positions. The determination whether Plaintiff and Kieschnick performed jobs requiring substantially the same responsibility is one for the jury.

This issue is sufficient to warrant the denial of Defendant's motion for summary judgment as to Plaintiff's disparate wages claim.   The court need not address, at this time, Plaintiff's counter-argument the he was the more qualified of the two with the better work review record.

To survive a summary judgment motion on a failure to promote claim, the plaintiff must produce some evidence in support of the following elements:  1) the plaintiff is a member of a protected class; 2) he sought and was qualified for the position; 3) he was not selected for the position; and 4) the employer continued to seek or promoted someone with the plaintiff's qualifications. Davis v. Dallas Area Rapid Transit, 383 F.3d 309, 317 (5th Cir. 2004).  If the plaintiff meets his burden of presenting evidence of a prima facie case and the employer articulates a legitimate reason for not selecting the plaintiff, the plaintiff may demonstrate that the reason was pretextual by showing that he was "clearly better qualified" than the person chosen.  Price, 283 F.3d at 723.

Claims arising under 42 U.S.C. § 1981 are governed by two separate limitations periods:  two years if the right existed prior to December 1, 1990, and four years if the claims was made possible

26

by a post-1990 enactment.  See generally Jones, 541 U.S. at 382 (explaining the application of the federal "catch-all" four-year statute of limitations to 42 U.S.C. § 1981 claims).  In 1991, Congress defined the phrase "make and enforce contracts" to include the "termination of contracts, and the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship." 42 U.S.C. § 1981(b).  This revision to 42 U.S.C. § 1981 overturned a prior Supreme Court case construing the statute as covering "only conduct at the initial formation of the contract and conduct which impairs the right to enforce contract obligations through legal process."  Patterson v. McLean Credit Union, 491 U.S. 164, 179 (1989); see also Jones, 541 U.S. at 383.

According to the Patterson court, a promotion claim was actionable under 42 U.S.C. § 1981 if "the nature of the change in position was such that it involved the opportunity to enter into a new contract with the employer," that is, "the promotion rises to the level of an opportunity for a new and distinct relation between the employee and the employer."  Patterson, 491 U.S. at 185.  If the promotion can be so characterized, then an action for the denial of the promotion was available under 42 U.S.C. § 1981 prior to the 1991 revisions and is subject to a two-year limitations period.

Defendant argues that Plaintiff's promotion claims are barred by the statute of limitations and are without merit.  Plaintiff

27

responds that his promotion claim took place after the formation of his employment contract and is covered by the four-year statute of limitations.   Plaintiff also argues the merits of his promotion claim.

Plaintiff claims that he expressed interest in the quality control assistant position in December 2001.   Bahena was promoted to that position in January 2002.   The quality control assistant position was a supervisory role with different responsibilities than Plaintiff's position.   Additionally, the pay rate was higher than Plaintiff's.   The court finds, as a matter of law, that the promotion Plaintiff sought provided an opportunity for new contractual relationship between Plaintiff and Defendant because of the increase in responsibilities, in particular supervisory duties, and the increase in wages.   Because it was in the nature of a new contract, the claim arises under the pre-1991 version of 42 U.S.C. § 1981.

Plaintiff originally filed this action in September 2003, but did not add federal claims until June 2004, more than two years after Defendant hired Bahena for the quality control assistant position.   Plaintiff failed to bring his promotion claim within the statutory limitations period.   Plaintiff's promotion claim should be dismissed without consideration of its merits.

   b.   **Retaliation**

Plaintiff alleged that Defendant retaliated against him for lodging complaints of race discrimination by transferring him from the overnight shift to the day shift.

To establish a prima facie case of retaliation, a plaintiff must show that (1) he engaged in a protected activity; (2) an adverse employment action occurred; and (3) a causal link existed between the protected activity and the adverse action. <u>Harvill v. Westward Commc'ns, L.L.C.</u>, 433 F.3d 428, 439 (5th Cir. 2005); <u>Gee v. Principi</u>, 289 F.3d 342, 345 (5th Cir. 2002). Protected activity includes complaining to supervisors about acts of unlawful discrimination. <u>See</u> 42 U.S.C. § 2000e-3(a); <u>Manning v. Chevron Chem. Co., LLC</u>, 332 F.3d 874, 883 (5th Cir. 2003).

The Supreme Court recently clarified the second prong of the prima facie case of retaliation in <u>Burlington Northern and Santa Fe Railway v. White</u>, ___ U.S. ___, 126 S.Ct. 2405 (2006). There, the court held that, for purposes of a retaliation cause of action, the adverse employment action requirement is not limited to hiring, granting leave, discharging, promoting or compensating, but may encompass any challenged action that a reasonable employee may consider materially adverse, "which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." <u>Burlington N. & Santa Fe Ry.</u>, 126 S.Ct. at 2415 (quotation marks and internal citation omitted)). The Court noted that "normally petty slights, minor annoyances, and

simple lack of good manners will not create such deterrence."
Burlington N. & Santa Fe Ry., 126 S.Ct. at 2415.

To satisfy the third prong of a prima facie case, plaintiff
must put forward some evidence of a causal link between the adverse
employment action and the protected activity.  Long v. Eastfield
Coll., 88 F.3d 300, 305 n.4 (5th Cir. 1996).  The existence of a
causal link may be determined by examining three factors:  "(1) the
employee's past disciplinary record, (2) whether the employer
followed its typical policy and procedures in terminating the
employee, and (3) the temporal proximity between the employee's
conduct and termination."   Dehart v. Baker Hughes Oilfield
Operations, No. 05-21087, 214 Fed. App. 437, 442 (5th Cir. Jan. 19,
2007)(unpublished)(citing Nowlin v. Resolution Trust Corp., 33 F.3d
498, 508 (5th Cir. 1994)).   Temporal proximity alone may be a
significant factor, but not necessarily determinative of
retaliation.  Mayberry v. Vought Aircraft Co., 55 F.3d 1086, 1092
(5th Cir. 1995); see also Roberson v. Alltel Info. Servs., 373 F.3d
647, 655 (5th Cir. 2004)(stating that the mere fact that an adverse
action occurs after protected activity will not always be enough to
establish a prima facie case); Evans, 246 F.3d at 354 (noting that
a time lapse of four months has been found sufficient to establish
a causal connection for purposes of summary judgment).

Defendant moves for summary judgment on Plaintiff's
retaliation claim on the bases that he experienced no adverse

employment action and that no causal link exists between any of his complaints and an adverse action.  Plaintiff contends that he experienced three adverse employment actions in retaliation for complaints he filed:  loss of email rights, transfer from night to day shift, and denial of promotion.  Plaintiff contends that the temporal proximity of these actions to his filing complaints raises a fact issue on the prima facie case and that the falsity of Defendant's articulated reason for transferring him raises a fact issue on pretext.

Defendant's briefing focuses only on the transfer.  Addressing it first, the court is not persuaded by Defendant's contention that "a shift change from night to day is generally considered a favorable employment action, and, certainly not an adverse one."[92] As Plaintiff notes, the transfer resulted in a loss of the shift differential hourly wage.  Also, less supervision and easier access to furnaces appear on the record as possible benefits enjoyed by Plaintiff during the night shift.  In connection with the transfer, Defendant directed Plaintiff to cross-train Bahena, the man Plaintiff believed to have placed the "KKK" sign on his car.

As the <u>Burlington Northern and Santa Fe Railway</u> court explained, the standard for determining whether employment decisions amount to actionable retaliation is stated "in general terms because the significance of any given act of retaliation will

---

[92]     Defendant's Reply, Docket Entry No. 126, p. 13.

often depend upon the particular circumstances.  Context matters."
Burlington N. & Santa Fe Ry., 126 S.Ct. at 2415.  In light of the
Burlington Northern and Santa Fe Railway decision, this court
cannot decide as a matter of law whether a reasonable employee
would have found the transfer to have been materially adverse.

Defendant also challenges the causal connection because
Plaintiff's letter to Bell was written after the decision to
transfer Plaintiff back to the day shift, as indicated by the fact
that Plaintiff complains of the transfer in the letter itself.  The
court agrees with Defendant that retaliation cannot be the motive
for an action that took place before the alleged protected
activity.  However, Plaintiff does not just cite the letter of
complaint to Bell as the only protected activity preceding his
transfer.  He also points to his complaint to Filkowski in late
2001 about his discovery of racial jokes in the work area.
Plaintiff's transfer occurred within a month or two of that
complaint.  The court finds the temporal proximity sufficient to
meet Plaintiff's prima facie burden.

Having found prima facie evidence of retaliation, the court
turns to Defendant's articulated reason for the shift change.
According to Defendant, the reason for the change was to improve
communications between Plaintiff and his supervisors and to allow

32

Plaintiff to catch up on furnace surveys.[93]  Plaintiff challenges
the veracity of Defendant's professed reason for transferring him
back to days.

The evidence shows that Plaintiff was behind on the furnace
surveys when he transferred to the night shift and that one reason
for the change to nights was to give him more access to the
furnaces so that he could catch up on surveys.  Additionally, a
letter written by his supervisor, Houghton, in April 2002 stated,
"Kenneth's position requires him to work alone and without a lot of
direct supervision.  He has done a good job of working this way."[94]
Although the evidence of pretext is minimal, at best, it does raise
questions as to the truth of Defendant's articulated reason for the
transfer.

Because Defendant has not challenged the other two alleged
acts of retaliation, denial of e-mail access and denial of
promotion, the court does not need to concern itself with those
allegations at this point.  However, the court does note that the
promotion complaint is barred by limitations as explained in a
prior section of this memorandum.

Thus, the jury will need to determine whether the transfer
and/or the denial of e-mail access caused Plaintiff to suffer a

---

[93]     See Defendant's Motion for Summary Judgment, Docket Entry No. 106,
Ex. W, letter from Filkowski to Plaintiff dated Jan. 22, 2002.

[94]     Plaintiff's Response, Docket Entry No. 121, App. 5, Ex. 34, letter
from Houghton to Harris County Community Supervision and Corrections Department
dated Apr. 18, 2002.

materially adverse change in the terms and conditions of his employment.  If so, then the question will be whether Plaintiff's evidence of pretext can overcome Defendant's articulated reasons for the actions taken.  This claim should not be dismissed on summary judgment.

**B.  State Law Claims**

The only state law claims remaining in Plaintiff's live pleading are interference with property and gross negligence.

**1.  Interference with Property**

In Texas, "[a]ny intentional invasion of, or interference with, property, property rights, personal rights or personal liberties causing injury without just cause or excuse is an actionable tort." Suprise v. DeKock, 84 S.W.3d 378, 380 (Tex. App.–Corpus Christi 2002, no pet.)(quoting King v. Acker, 725 S.W.2d 750, 754 (Tex. App.–Houston [1st Dist.] 1987, no writ)).  The elements of an interference with property cause of action are:  1) interference with one's property or property rights; 2) the interference was intentional and caused damage; and 3) the interference was without just cause or legal excuse. Martinez v. Benavides, No. 04-05-00618-CV, 2006 WL 1993773, at *2 (Tex. App.–San Antonio, July 19, 2006, no writ)(unpublished).

Defendant argues that Plaintiff offers nothing more than unsubstantiated assertions and unsupported speculation that persons tampered with his vehicles.  Moreover, Defendant continues,

34

Plaintiff cannot connect the alleged occurrences to Defendant. Plaintiff does not defend this claim against summary judgment.

The summary judgment record is lacking evidence in support of this claim. Plaintiff's testimony regarding the alleged incidents of vandalism is nothing more than speculation. He testified that, on more than one occasion, he saw a coworker near his car in the company parking lot and later found some sort of damage to his vehicle. He also presented a couple of receipts to show that he took his vehicle in for repairs. Plaintiff points the court to no other evidence in support of his claim.[95]  The evidence simply is not enough to lead a rational jury to conclude that anyone intentionally interfered with Plaintiff's vehicle or that Defendant is liable for the actions of anyone who did. This claim should be dismissed.

**2.  <u>Gross Negligence</u>**

Under Texas law, a plaintiff may plead gross negligence as grounds for exemplary damages. <u>See</u> Tex. Civ. Prac. & Rem. Code Ann. § 41.003(a). Gross negligence refers to an actor's engagement in an act or omission that objectively involves an extreme degree of risk, "considering the probability and magnitude of the potential harm to others," and, in spite of actual, subjective

---

[95]    It is not incumbent on the court to search the record for triable issues. <u>Ragas v. Tenn. Gas Pipeline Co.</u>, 136 F.3d 455, 458 (5th Cir. 1998). The duty to identify evidence and its connection to the issues raised falls squarely on the party opposing summary judgment. <u>Id.</u> Unsubstantiated assertions are not competent summary judgment evidence. <u>Id.</u>

awareness of the risk, the actor "nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others." Tex. Civ. Prac. & Rem. Code § 41.001(11); <u>Dillard Dep't Stores, Inc. v. Silva</u>, 148 S.W.3d 370, 373 (Tex. 2004).

Defendant contends that Plaintiff's claim for gross negligence as it relates to injuries to his person is barred by the Workers' Compensation Act and that Plaintiff has not produced evidence that the damage actually occurred or that Defendant was consciously indifferent to any risk of harm to Plaintiff's property. As with the interference with property claim, Plaintiff provides no response to Defendant's arguments and points to no evidence in support of this claim.

As Defendant points out, workers' compensation benefits[96] make up the sole remedy for employees who sustain injuries in the course of their employment. Tex. Labor Code § 408.001(a); <u>see also Tri-Coastal Contractors, Inc. v. Hartford Underwriters Ins. Co.</u>, 981 S.W.2d 861, 864 (Tex. App.-Houston [1st Dist.] 1998, pet. denied); <u>Dickson v. Silva</u>, 880 S.W.2d 785, 788 (Tex. App.-Houston [1st Dist.] 1993, writ denied).[97] Therefore, Plaintiff may not pursue a claim

---

[96] There is no dispute that Plaintiff was covered by workers' compensation insurance. <u>See</u> Defendant's Motion for Summary Judgment, Docket Entry No. 106, Ex. MM, employee handbook, p. 16.

[97] Although the <u>Dickson</u> case was governed by Texas Revised Civil Statutes, article 8306, which is no longer in effect, the current version leads to the same result. <u>See</u> <u>Tri-Coastal Contractors, Inc.</u>, 981 S.W.2d at 864.

of gross negligence against Defendant for personal injuries he
suffered at work.  <u>See</u> <u>Dickson</u>, 880 S.W.2d at 788.

      With regard to Plaintiff's claim of vandalism and theft, the
evidence does not support a finding that Defendant was grossly
negligent in its treatment of Plaintiff and his property.  As
discussed above, Plaintiff's allegations of vandalism and theft are
based solely on his own speculation.  Nothing in the record reveals
a likelihood of any injury to Plaintiff's property, much less the
possibility of serious injury.  Absent evidence of extreme risk,
Plaintiff cannot meet his burden of demonstrating Defendant's
conscious indifference to that risk.  Furthermore, the evidence
demonstrates that Defendant disapproved of vandalism and theft and
encouraged Plaintiff to report the conduct.[98]  In a complaint he
filed with the police, Plaintiff acknowledged that Defendant did
not condone vandalism and that Defendant had responded
appropriately to his reports of property damage.[99]

      Plaintiff has failed to point the court to any evidence, and
the court has found none on its own review, that supports his
claims for exemplary damages.  Accordingly, the gross negligence
claim should be dismissed.

## IV.  Conclusion

-----

[98]    <u>See</u> Defendant's Motion for Summary Judgment, Docket Entry No. 106,
Ex. MM, employee handbook, pp. 16, 19; Ex. W, letter from Filkowski to Plaintiff
dated Jan. 22, 2002.

[99]

37

Based on the foregoing, the court **RECOMMENDS** that Defendant's motion be **GRANTED IN PART** and **DENIED IN PART**.

The Clerk shall send copies of this Memorandum and Recommendation to the respective parties who have ten days from the receipt thereof to file written objections thereto pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002-13. Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk, either electronically or by mail to P.O. Box 61010, Houston, Texas, 77208.  Copies of such objections shall be mailed to opposing parties and to the chambers of the undersigned, 515 Rusk, Suite 7019, Houston, Texas 77002.

**SIGNED** in Houston, Texas, this 21st day of June, 2007.

Nancy K. Johnson
United States Magistrate Judge

38